Anderson, J.,
delivered the opinion of the court.
The court is of opinion that, there is nothing in the record to show that the debt of James A. Beville to Mrs. Jane E. Moore, as evidenced by his note, and secured by deed of trust on his house and lot, is not genuine and bona fide, and for the consideration appearing on the face of said papers. The proof is that Mrs. Moore after the death of her husband, which occurred in the fall or winter of 1877, received $5,000 in money, in payment of *508 his life policy, and that she loaned $1,000 of it to her brother, the said James A. Beville, for which he executed to her the said note and deed of trust. She at another time loaned him $800 or $850, which was secured upon horses and other personal property, which they call “ livery stock.” That deed is absolute on its face, but was evidently intended only as security. She admits this debt was paid. And the bond for $800, with credits endorsed upon it, showing its entire satisfaction, is exhibited by James A. Beville with his deposition.
It is alleged by the creditors of Benjamin Beville, father of said James A., that the said lot was purchased and paid for by the said Benjamin, wrho caused the same to be conveyed to his said son in fraud of his creditors, and that Mrs. Moore had notice of it when she loaned the money on said security, and thereby became a pai’ticipant in the fraud. It is a well established principle, that fraud must be proved, and cannot be presumed. Both James A. Beville and Mrs. Moore deny the allegation of fraud, and the latter denies that she had any knowledge of it, if there was fraud in the procurement of the title to the lot by her grantor. James A. Beville testifies that he never informed her or any one that the lot was acquired by him from his father. And Mrs Moore, in answer to the question, if she ever had any intimation or knowledge of any kind that her father had advanced or paid the purchase money on this house of James A. Beville’s at the time of or prior to her loan of $1,000 to James A. Beville, swears that she never had. Her language is, “ none in the world.” And she declares, in answer to another question, that she loaned the money upon the faith of James Beville’s deed to the land. There is proof positive that Benjamin Beville was indebted to his son, and that Colonel Boyd was indebted to him, and that he told his son Colonel Boyd wished to sell him a lot, and proposed to him that if he *509 would take it in payment of what he owed him, that they would make the trade; which his son agreed’ to. And the next day they went to see Boyd, and met him near where his (witness') house is. They walked up to where Susan Bumgardner now lives, and Colonel Boyd gave him the option to take that lot or the one he now owns. He told him he would take the latter, and lus father directed Colonel Boyd to have the deed made to him. Colonel Boyd does not remember the particulars, though he says they might have occurred as stated, and what he does remember is consistent with the foregoing statement. The foregoing is proved by James A. Beville, who does not appear to have any pecuniary interest in the question. He files with his deposition his account against his father, being for money loaned and work done; and swears to the correctness of it. Although he was under age, he had entered the army of the Confederacy, and having been wounded in the service in 1862, was at home for about eight months, when he made a large portion of the amount of his account by dealing in liquor. A portion of the money was made before he entered the army—his father giving him his time—and which, together with money he sent home to him from the army, and the money he had made by dealing in liquor, which he loaned his father, constitutes his account, of all which he says he kept memoranda in his memorandum book, from which the account exhibited was copied, and which book he exhibited when asked to do so by the adverse counsel. There is no evidence in the record contradicting the testimony of this witness, or to impeach his credit; nor is there any direct testimony to prove that Mrs. Moore had any knowledge or intimation of fraud, if there was fraud, in the transaction between Benjamin Beville and her grantor at the time she made him the loan and took the deed of trust as security, or prior thereto.
*510 But the plaintiffs in the original suit and defendants to Mrs. Moore’s bill of injunction, rely on circumstances establish the alleged fraud in this transaction, and Mrs. Moore’s knowledge of it. They charge that Benjamiri Beville was largely indebted, and had previously executed a deed, to-wit: on the 28th of September, 1860, conveying to his son-in-law, A. A. Moore, all his property, real and personal, with the fraudulent intent of hindering and delaying his creditors in the recovery of their debts; and thence infer that he caused the deed to be made to his son with the same fraudulent intent. And Mrs. Moore having admitted that she had been informed by her father that said deed of September, 1860, had been made with such intent, they contend that it is thence inferable that she was aware that he caused the deed for the lot in question, of the 15th of September, 1863, to be made to his son James, with the same fraudulent intent, although she denies having had any such knowledge.
But the latter transaction seems to be distinct from and to have had no connection with the former, and to have occurred about three years thereafter. And the deed to secure her loan was made nearly nine years thereafter, six years after the deed conveying the lot to James A. Beville was made and recorded. And the adverse parties had acquiesced in his possession and •ownership during that whole period without setting up any claim upon it to satisfy their debts, and for several years afterwards. But she testifies that she never had an intimation or knowledge of any kind that her father had advanced or paid the purchase money on this house and lot of James A. Beville. Again, she swears that •she never heard from any. one that her father paid the money for this house and lot and had the deed made to •James. She also says she does not know when the lot in question was sold to James. But if she had no know *511 ledge that her father had paid the purchase money for the lot and had the deed made to James, how can she be charged with notice of fraud in the conveyance of the title to James? Ve will attempt no further analysis ■of her testimony, but will only remark that, when fairly •construed, we think there is no part of it inconsistent or in conflict with the citations we have made from it; and she manifests in no part of it a disposition to withhold anything she knows, but the whole is characterized with perfect frankness, when her answers are prejudicial to her interest as well as when they are in her'favor. And the court is of .opinion that the plaintiffs in the •original bills and the defendants in the injunction bill, have wholly failed to invalidate the deed of trust executed by Janies A. Beville and wife on the house and lot in question, to secure the loan of $1,000 from Mrs. Moore.
But the defendant, David Sexton, claims to be substituted to the rights and remedies of the Southwestern Bank, which, he alleges, has a judgment lien upon the said lot, which is prior to the lien of the plaintiff; It is the judgment of said bank against Benjamin Beville, who, he contends, had an equitable title to the lot in question. Commissioner English, in his report, says it seems to have been rendered and docketed in August, 1861—more than two years prior to the date of the deed from Robert C. Kent, commissioner, to James A. Beville, and about •eight years prior to the conveyance of the same lot, with the improvements he had put upon it, in trust, to secure the loan he had made from his sister, Mrs. Moore. "We have seen that if said lot was purchased by Benjamin Beville, and paid for out of his own means, and that he •caused the deed for it to be made to his son James, in fraud of his creditors, that Mrs. Moore had no knowledge of it when she lent her money to the said James, *on the faith of said lot as a security, and he conveyed *512 it in trust to secure her; and consequently that her deed was valid and unaffected by the fraud between Benjamin and James A. Beville, if any such existed. If the account given by James A. Beville of that transaction is true, and his father, Benjamin Beville, was indebted to him, and an agreement was made between them that if he would agree to take a lot from Colonel Boyd in satisfaction of what he owed him, he would purchase it from Colonel Boyd for him, and pay Boyd the price of the lot out of a debt Boyd was owing him, and that in pursuance of that agreement the lot was purchased from Boyd and conveyed to him, the said James, the said Benjamin did not thereby acquire any equitable title or interest in said lot which could subject it to the lien of the said judgment of the Southwestern bank. But if this were not so—if the said Benjamin Beville had purchased the said lot and paid for it out'of his own means, and had it conveyed to his said son in fraud of his creditors, of which the proof in the record is by no means full and satisfactory, we have seen that Mrs. Moore, being a purchaser of the legal title thereof six years afterwards, for value, without notice of the fraud, if there was fraud, or of any equity in Benjamin Beville, is unaffected by the fraud, and her title is good against any equity of Benjamin Beville—is it good against the equity of the creditor of Benjamin Beville by virtue of his judgment lien ?
If the said Benjamin Beville ever held any interest in said lot there is nothing upon record to show it. There is a clear title conveyed by It. C. Kent, commissioner of the court, to James A. Beville for the lot in question. The said deed passes Col. Boyd’s title directly to him, and it is made to him in pursuance of a decree of the county court of Wythe county of the 15th of September, 1863, to which David Sexton was a pai’ty, and which recites that it was theretofore purchased by David F. *513 Boyd under a prior decree in said cause ordering the sale of Thomas J. Boyd’s lands for the sum of seven hundred and fifty dollars, which has beeu paid to said Kent as receiver; and the deed proceeds, “ therefore, in consideration of the premises aforesaid, and of a transfer from said David F. Boyd to said James A. Beville, the said Robert C. Kent, commissioner as aforesaid, doth hereby grant, with special warranty, unto the said James A. Beville and his heirs and assigns, a lot or parcel of land,” therein described, which is the lot in question. And the deed goes on further to state as follows: “ The above-named lot, purchased and paid for as aforesaid by said David F. Boyd, has been sold by him, by Thomas J. Boyd, his attorney-in-fact, in pursuance of a power of attorney executed by said David F. Boyd, and filed with the papers of said cause, for a valuable consideration, to .the said James A. Beville, which consideration has been paid by said Beville to Thomas J. Boyd as attorney-in-fact of the said David F. Boyd,” the receipt whereof is acknowledged. “ Therefore the said Robert O. Kent, commissioner as aforesaid, is hereby authorized and directed to convey the said lot of land to the said James A. Beville in the stead of the said David F. Boyd.” This deed was put upon record and was notice to the world, and instead of giving notice that Benjamin Beville was an intermediate purchaser, absolutely excludes the idea, because it represents that the sale was made by the commissioner to David F. Boyd, and by him, by his attorney, directly to James A. Beville, and the payment of the purchase money by said James A. Beville to the said attorney of David F. Boyd, and that the commissioner was authorized by him to make the conveyance directly to the said James A. Beville, and the name of the said Benjamin Beville is nowhere alluded to in the said deed. If it were true that Benjamin Beville had a secret equita *514 ble interest in tbe said lot, which is contradicted by the recitals of the deed, could the creditor’s judgment lien attach to that so as to over-reach the legal title of the purchaser from James A. Beville for value and without notice ? The docketing of the judgment is required to give notice to subsequent purchasers. But the docketing of a judgment against Benjamin Beville could give no notice oí a lien of the judgment upon the land of James A. Beville, the holder of 'the legal title, by virtue of a secret equitable title which Benjamin Beville once had to the land, of which the bona fide purchaser for value from James A. Beville of the legal title, had no notice.
The deed of trust from James A. Beville to K. C. Kent for the benefit of David Sexton, was made subsequent to the deed of trust given to secure the debt to Mrs. Moore, and any admissions made by him in that deed could not be binding on Mrs. Moore.
Upon the whole, the court is of opinion that there is error in the decrees of the circuit court so far as they invalidate said deed of 29th of April, 1869, or subject said lot to the lien of any judgment or judgments against Benjamin Beville as against the said security of Jane E. Moore, or give priority to the subsequent deed of trust executed by James A. Beville for the benefit of David Sexton, or which require the sale of said lot for any purpose inconsistent with priority of right in -the said Jane E. Moore, and to this extent said decrees must be reversed with costs, and in all other respects the court is of opinion to affirm them.
Burks, J., dissented.
Decree reversed.